

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, and <br> MARIA DEL CARMEN GAMBOA FERGUSON <br><br> Plaintiffs/Relator <br><br> -v- <br><br> LOCKHEED MARTIN AERONAUTICS COMPANY, <br> LOCKHEED MARTIN CORPORATION d/b/a <br> LOCKHEED MARTIN AERONAUTICS COMPANY <br><br> Defendants. | Civil Action No. <br> 3-16CV2995-B <br><br> FILED UNDER SEAL <br><br> *JURY DEMANDED* <br><br> SEALED |

## QUI TAM ORIGINAL COMPLAINT

*TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE*:

RELATOR *MARIA DEL CARMEN GAMBOA FERGUSON* (hereafter "Ferguson"), brings this qui tam action in the name of the United States of America, pursuant to 31 U.S.C. § 3729 *et seq.*, as amended (False Claims Act) to recover all damages, penalties and other remedies established by the False Claims Act on behalf of the United States.

## I.
## SUMMARY INTRODUCTION

1.  This is an action to recover damages and civil penalties on behalf of the United States of America for violations of the False Claims Act. This action arises out of Defendant Lockheed Martin Corporation d/b/a Lockheed Martin Aeronautics Company and/or Lockheed Martin Aeronautics Company's (hereafter collectively "LMAero") actions in overcharging the United States of America (hereafter "USA") on various large defense contracts. LMAero has

accomplished this via the knowing and systematic certification and/or passing through of unsupported and/or inadequately verified offshore subcontract pricing for labor, material and/or buildings for the purpose of generating higher revenues at the expense of the USA and the American taxpayer. LMAero has further accomplished this via the use of systematic retaliation against LMAero employees who have undertaken actions in opposition to this overcharging, of which employees include Ferguson.

2. The False Claims Act was enacted during the Civil War. Congress amended the False Claims Act in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the False Claims Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

3. The False Claims Act provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the U.S. Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government.

4. The Act allows any person having information about a false or fraudulent claim against the Government to bring an action for himself and the Government, and to share in any recovery. The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

5.  This is an action for treble damages and penalties for each false claim and each false statement under the False Claims Act, 31 U.S.C. §3729, et seq., as amended.

## II.
## PARTIES

6.  Plaintiff/Relator Ferguson is an individual who is a citizen and resident of the State of Texas.

7.  The United States can be served with this lawsuit through the United States Attorney General and the United States District Attorney for the Northern District of Texas.

7.  Defendants are corporations doing business in this judicial district and can be served with process upon their agent for service of process: <u>Corporation Service Company d/b/a CSC Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701</u>.

## III.
## JURISDICTION AND VENUE

8.  Jurisdiction is proper in this Court because this is a federal question action, 28 U.S.C. § 1331, arising under the False Claims Act, 31 U.S.C. § 3730(b).

9.  LMAero is a corporation doing business in Tarrant County, Texas.

10. There have been no public disclosures of the allegations or transactions contained herein that bar jurisdiction under 31 U.S.C. § 3730(e).

11. Venue is appropriate in this Court, pursuant to 28 U.S.C. § 1391, because the acts giving rise to this case occurred in this judicial district.

## IV.
## FACTUAL ALLEGATIONS

12.  Ferguson has personal knowledge of all of the following facts, which she learned in the course and scope of her employment at LMAero.

13.  This action centers on LMAero's actions in overcharging the USA on various large defense contracts and retaliating against employees opposing same. More particularly, this action arises out of LMAero's systematic purposeful lax oversight over fraudulent offshore subcontractor pricing submissions under various USA defense contracts. The amount of overcharges easily exceeds well over eleven million dollars ($11,000,000+) and is actively continuing.

14.  LM Aero Supply Chain Management and Executive leadership support and encourage the inadequate verification of offshore supplier costs (cost analysis) resulting in overcharging to the government for the purpose of generating higher revenues for the company. Cost analysis on second and lower tier suppliers over the Truth in Negotiations Act, 10 U.S.C. § 2306 *et seq.* (hereafter "TINA") threshold are systematically not being enforced or validated by LMAero as required to ensure that proposed costs at those levels comply with the appropriate Federal Acquisition Regulations (hereafter "FAR") requirements and excessive/unallowable charges are not passed on to the USA. This results in a layering phenomena where the overcharging at multiple levels further compounds LMAero's realized revenues and profits at the expense of the USA, as the USA is particularly vulnerable with oversees suppliers whose cultures embrace as shrewd that which the FAR treats as fraud.

15.  LMAero's actions relating to the above include the following, by way of a few pertinent examples and not exhaustion:

A. As enforced through TINA, FAR 15.404-1 requires LMAero to perform adequate Price and Cost Analysis on its suppliers in support of costs submitted in its proposals to the USA. By systematic design, LMAero does not validate that its sub-tier suppliers perform adequate price or cost analysis of their subcontractors nor does LMAero perform adequate cost analysis on their suppliers when required. The effect of this defective pricing strategy is that LMAero yields profit and overhead on the excessive costs that it is passing through to the USA. LMAero systematically accomplishes this in several ways:

1. LMAero leadership has reduced its internal Subcontract Audit Group size and scope of activities to reduce the impact the group is having on revenues resulting from the disallowance of supplier overcharging. LMAero has undertaken this action in response to the fact that the Subcontract Audit Group, under Ferguson's leadership, has uncovered and internally identified to LMAero management numerous instances over the course of several years in which:

    a. LMAero has, and still is, knowingly passing through inadequately or non-validated offshore supplier costs to the USA on a large and systematic scale;

    b. LMAero knowingly does not require nor validate that offshore suppliers perform cost analysis on their suppliers as required by TINA;

    c. multiple incidents were identified by Ferguson and reported internally to LMAero wherein LMAero reported/certified to the USA that it had validated an offshore suppliers' direct labor hours, when in fact internal audits reveal that it had not or had not adequately done so;

    d. multiple incidents were identified by Ferguson and reported internally to LMAero wherein LMAero repeatedly and knowingly submitted cost and pricing data which states that they have reviewed offshore Suppliers Bills of Materials when in fact internal audits reveal they have not so;

    e. multiple incidents were identified by Ferguson and reported internally to LMAero wherein LMAero did not ensure that offshore suppliers' accounting systems were adequate to capture costs or labor hours on government contracts prior to contracting actions. LMAero knows that offshore suppliers often have systems which do not accurately capture direct labor hours and due to these inadequacies are used or knowingly allowed to support fraudulent costs within the contract rates structures;

    f. LMAero encourages the use of cost analysis by DCAA/DCMA with the knowledge that in most instances, the Defense Contract Audit Agency (hereafter "DCAA") is resource constrained and not able to complete an audit on offshore suppliers, resulting in unchallenged indirect cost elements of the proposal and decrements averaging only 5% when audits are completed but which decrements are repeatedly found to be at a substantially higher percentage when audited internally. When costs are not audited, suppliers pass on indirect costs which remain unchallenged and overcharging occurs;

    g. LMAero continues to systematically engage in business with offshore suppliers that it knows have defective cost controls without requiring that

       the suppliers correct their systems or practices and continues to certify the resulting pricing to the USA as part of the government contract;

  h. In response to the actions of Ferguson in exposing, complaining about and opposing the foregoing fraudulent actions involving LMAero to its management over the course of several years, LMAero has systematically retaliated against her through a series of demotions and/or the shrinking of the Subcontract Audit Group she manages and a via significant ongoing reduction in her employment compensation.

16. Ferguson is aware of at least three and likely several other, large government contracts wherein the foregoing actions have occurred and/or are continuing to occur as follows:

  A. Purchase Order Number – 6533139085; Buyer RFP # - DWC10-0205-001 REV 1 Seller Proposal Number # "Empennage structures of C-130 J

    1. In the price cost analysis memo executed by the LMAero Supply Group analyst, on October 9, 2013 (PNM-C130-11959), he stated the following: " LM Aero Business Management was notified via attachment (F) of the negotiated settlement with TLMAL.[1] No information was recognized during negotiations to be inaccurate, incomplete, or non-current. No data was submitted that was not relied upon or utilized in negotiating this final price." The above statement at the time it was made was known to be false as the analyst was aware that direct labor hours had been requested from the subcontract supplier (TLMAL), who refused to submit them. Instead the analyst used information of unknown origin in determining the total direct

---

[1] TLMAL is an offshore [India] subcontract supplier to LMAero. TLMAL is a joint venture owned by LM/LMAero and another Indian corporation. So, this matter involved a subcontract pricing negotiation and ultimately an agreement between LMAero as the general contractor on the one hand and a subcontract supplier on the other hand of which LM/LMAero is a part owner.

labor hours for TLMAL. Ferguson's Subcontract Audit Group concluded that the potential costs that should not have been allowed likely exceeded 12% or more. There are at least three other similar contracts executed during this time frame that likely have similar issues.

2. Underlying the above misrepresentation is a massive fraud scheme that LMAero was a knowing part of. More specifically, TLMAL knowingly submitted false direct labor hour information to LMAero to inflate the proposal price negotiated with LMAero and later the USA. LMAero Supply Chain did not insist on updated actual pricing prior to negotiating its price with the TLMAL joint venture to verify the pricing information previously provided by TLMAL was accurate. TLMAL was requested by Ferguson's Subcontract Audit Group to provide such information to the auditors, but it refused to do so, stating that they had already reached an agreement with LMAero and would not submit more current information. A year later, in 2014, at the request of the DCAA, TLMAL submitted false data to the DCAA/USA, which was knowingly passed through by LMAero, to support the proposal price negotiated between TLMAL and LMAero which ensured that LMAero was reimbursed for the amount contracted to TLMAL. In 2016, Ferguson's Subcontract Audit Group reviewed the TLMAL Timekeeping system and determined that when TLMAL reported hours to the LMAero in 2013 and later to the DCAA/USA in 2014, the hours were intentionally overstated by approximately 22%. When the labor hours are loaded with overhead, G&A and profit, the result was an $11 million in the contract price.

3. This $11 million figure is just the tip of the iceberg as it does not include the other false assertions made by TLMAL and the impact thereof. Ferguson's Subcontract Audit Group uncovered a veritable treasure-trove of fraudulent subcontract submissions involving TLMAL. For example, Ferguson and her group discovered that: (a) TLMAL pays TASL (the Indian part owner of TLMAL, along with LM/LMAero) fees for support of TLMAL at the rate of $50,000 per shipset which are excessive and have little basis in supported expenses; (b) TLMAL sells TASL (its part owner--related party) assets (busses and generators) which were paid for under the TLMAL contract at substantially reduced prices; (c) TLMAL has contracted with TASL for goods and services through what is contends is a "competition," but with inadequate support to indicate that any actual competition took place; (d) LMAero knowingly did not properly assess the competitive bids engaged in by TLMAL when they performed their price analysis of the Bill of Material; (e) TLMAL purchases its various insurance contracts with TASL at excessive prices and escalations; (f) TLMAL has entered into agreements for services, such as security and cleaning with vendors that are excessive both for TLMALs specific needs and priced higher than the prevailing Indian wages; (g) it appears that TLMAL is paying for these services and that TATA Sikorsky, a facility 100 yards away from TLMAL is also benefiting from these contracts at no cost; (h) TLMAL appears to be sharing labor paid under the Empennage contract with the Sikorsky facility next door[2]; (i) TASL

---

[2] Ferguson's Subcontract Audit Group found employees on the TLMAL Empennage work orders that were charging hours but their salaries were not paid by TLMAL. TLMAL stated that these employees were being trained at the

employees are used to inflate the direct labor hours expended on the Empennage to make it appear as though hours expended are greater than what is actually incurred by including both indirect and direct labor in its calculation of direct labor; (j) TLMAL told Ferguson's Subcontract Audit Group that LMAero told them they could depreciate their building and capital assets over extremely aggressive life cycles and be reimbursed through the contract and that in the TLMAL the joint venture concept discussions, this was a critical component of the feasibility study. All of these costs are being passed through by LMAero and are paid by the USA and the American taxpayer.

4. During negotiations with TLMAL on the 2016 follow on proposal for Empennage Structures, Ferguson's Subcontract Audit Group identified TLMALs attempt to oversupport direct labor incurred by inflating the labor with training activities. The auditor also removed a substantial amount of excessive unsupported costs that TLMAL was found to by lying about. When the auditor removed these costs, the resulting auditor recommended costs were approximately 101 Million dollars. TLMAL had proposed 154 Million dollars. When the program determined that TLMAL would not be receiving the 154 Million dollars, the Offset Program Office stated that they would be penalized for not meeting their offset obligations. To avoid penalties, LMAero Offset Office solicited a proposal from TLMAL for non-recurring

---

TLMAL location to work at other TASL entities. TLMAL is not reimbursed for the costs associated with these employees and the auditor witnessed employees at the Sikorsky site working on the production floor with TLMAL uniforms on. The TLMAL Timekeeping system allows employees stay logged onto work orders and not be present at the facility. This enables employees to log on to work orders at the TLMAL facility but work at the Sikorsky facility. Sikorsky is partly owned by Lockheed Martin and does work primarily for commercial areas.

---

work in the amount of 15 Million dollars. Ferguson's Subcontract Audit Group was instructed by LMAero's legal department to allow as reasonable and allocable all costs associated with TLMALs proposals stating that special offset FAR conditions were applicable. In this contract TLMAL was purchasing capital equipment both at TATA Sikorsky and TLMAL. These assets were then being used to create new capabilities at both locations and were being categorized as Direct Material instead of Capital Assets. LMAero Legal and LMAero accounting stated that where offsets were involved, all costs were deemed allowable and reasonable and should not be questioned. However, in auditing TSAL Costs, the auditors determined that TSAL direct labor was irregular compared to TSAL revenue streams and when compared to TLMAL, TLMAL's labor was behaving irregularly as well. The two labor system records appeared to offset each other. When TLMAL's labor should have been going down, and TSAL's labor should have been going up, TLMALs labor was showing negative learning and TSALs labor was fairly flat. This was further support to the auditor that TLMAL was subsidizing TSALs direct labor so that the TSAL commercial contracts could profit even more.

B.     Korean Aerospace Industries – Value $29 M USD
      LM Aero RFP – C130J-AAH-20012-006 updated April 23, 2012
      KAI Proposal RFP – KAI2012130J_120727

1. In 2012, in order to definitize a contract between LM Aero and KAI, the LMAero Supply Chain analyst bypassed the most recent 2012 LMAero Subcontract Audit Group cost analysis (audit) and used an earlier 2011 audit

which was based and relied upon inadequate cost and pricing data. In the 2012 audit of KAIs proposal support, the Subcontract Audit Group identified significant weaknesses in KAI's, direct labor, overhead pools, and cost allocations schemes which would have resulted in higher prices to LM Aero and in turn the USA. The analyst was aware of these issues as they were identified in the audit report. The analyst knowingly and purposefully used outdated information to justify a higher price, which would result in greater profit for LMAero.

2. In the price cost analysis memo executed by the Supply Chain analyst on October 30, 2013(KAI (C130J MY 2.1-AFT Nacelle)) he stated the following "LM Aero Business Management was notified via attachment (E) of the negotiated settlement with KAI. No information was recognized during negotiations to be inaccurate, incomplete, or non-current. No data was submitted that was not relied upon or utilized in negotiating this final price." The above statement at the time it was made was known to be false as the analyst again used an outdated audit from a prior year to determine final price. The Subcontract Audit Group concluded that that potential costs not allowed likely would have exceeded 20% or more.

C. Esterline – Kirkhill, Value - $191,645,473
Dots Seals and gaskets for F-35. LRIP 4-9
RFP -N-2009-SH-01
POP 2010-2015

Ferguson's Subcontract Audit Group found that LMAAero Supply Chain analysts routinely do not use Cost Analysis on all elements of cost as prescribed in FAR regulations to evaluate supplier costs when Proposals exceed the TINA threshold.

This is one example. Here, in 2014, Ferguson's Subcontract Audit Group found that in the analysis of Kirhills costs, the LMAero Supply Chain analyst did not evaluate actual costs associated with scrap for each part, but instead used number of parts scrapped to develop a negotiation position. Kirkhill used scrap factors that were developed using standard and which were not updated to reflect actual costs. Further, Kirkhills' accounting system did not collect scrap costs during the time period when these negotiations took place and as such they could not support the value of the part at the point when it was scrapped in the manufacturing process. The LMAero Supply Chain analyst gave the supplier from 12% to 48% on total part costs. This has the effect of inflating contract costs by more than $20 million based on assertions related to scrap which were not tested and could not be substantiated. This is how LMAero Supply Chain consistently and improperly underevalutes supplier costs and then passes these costs on to the USA.

17. These are only three examples of how LMAero Supply Chain repeatedly utilizes inadequate analysis on supplier costs in order to definitize purchase orders and pass on higher prices to the USA. These actions by LMAero Supply Chain analysts are not isolated, but rather are part of a intentional scheme conceived and implemented by LMAero with full awareness that they will not be audited by the USA during negotiations and the higher costs will be reimbursed to LM Aero with profits and associated overheads, provided that Ferguson's Subcontract Audit Group can be kept in check.

18. LMAero's aforesaid actions with respect to the above contracts constitute a fraud against the USA in that they are violations of the following federal statutes:

      A.      making false statements to the government, 18 U.S.C. § 1001 through improper or false pricing certifications made to the USA and also covering up a scheme to create a fake $11 million accounting offset to avoid millions of dollars in losses to LMAero that would otherwise have resulted from large decrements flowing from Ferguson's internal audits;

      B.      presenting false claims for contract payments, regardless of whether paid or not, 18 U.S.C. §§286-287, 10 U.S.C. § 3729, 10 U.S.C. § 2324;

      C.      mail fraud and wire fraud, 18 U.S.C. § 1341 and 18 U.S.C. § 1343, as the false statements, false claims presented to the government involved the use of United State Postal Mail, telephone line and internet wire access;

      D.      collusive agreement (*i.e.*, a conspiracy), 31 U.S.C. § 3729 and 18 U.S.C. § 371, between and amongst LMAero employees/officers/vice principals and subcontractor officials to agree to conceive and implement a systematic scheme to defraud the USA by knowingly accepting, passing through and/or certifying to the USA contract pricing overcharges resulting from known false or inaccurate pricing information submitted by offshore suppliers;

      D.      violation of TINA, 10 U.S.C. § 2306 via violations of the FARs enforced therein, including, but not limited to, FAR 15.801, 31-205 as well as DFARS 252.244-7001.

19.    In making her above described complaint to LMAero, Ferguson reasonably believed, and continues to reasonably believe, that LMAero was and continues to be complicit in perpetrating a large scale fraud against the USA and the American taxpayer.

20.    Ferguson is the primary whistleblower source of LMAero's fraudulent actions as described herein and there has not been a prior public disclosure of these actions.

## V.
## CAUSE OF ACTION

21. Ferguson fully incorporates each and every fact set forth in paragraphs 1 through 20 above with respect to each and every cause of action set forth below.

   A.   *Count One – Violation of False Claims Act*

22. False Claims Act liability attaches to any person who knowingly presents or causes a false or fraudulent claim to be presented for payment, or to a false record or statement made to get a false or fraudulent claim paid by the government. 31 U.S.C. § 3729(a)(1)&(2).

23. Under the False Claims Act, "knowing" and "knowingly" mean that a person, with respect to information:

   (1) has actual knowledge of the information;

   (2) acts in deliberate ignorance of the truth or falsity of the information; or

   (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b).

24. The False Claims Act is violated not only by a person who makes a false statement or a false record to get the government to pay a claim, but also by one who engages in a course of conduct that causes the government to pay a false or fraudulent claim for money. *Id.*

25. By virtue of the acts described above, Defendant LMAero knowingly caused and/or continues to cause to be submitted, false or fraudulent claims to the USA for payment under multiple large defense contracts, to include, at a minimum the aforementioned two.

26. The United States Government paid and continues to pay such false claims well in excess of eleven million dollars ($11,000,000.00+).

27. By reason of Defendant LMAero's acts, the United States Government has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

      A.      *Count Two – False Claims Act Retaliation*

28. As described above, LMAero subjected Ferguson to unlawful employment retaliation as a result of her ongoing complaints and opposition to its unlawful fraudulent acts as set forth herein. LMAero's actions violated 31 U.S.C. § 3730(h).

29. As a result of LMAero's actions in unlawfully retaliating against Ferguson as described herein. Ferguson is entitled to injunctive relief as well as actual damages, to include lost wages and benefits, both past and future, two (2) times the amount of back pay, and special damages, all of which she seeks to recover herein.

## VI.
## JURY DEMAND

30. Ferguson hereby exercises the right to trial by jury on claims, issues and defenses in this action.

## VII.
## PRAYER

*WHEREFORE*, Relator Maria del Carmen Gamboa Ferguson, on behalf of herself and the Unites States of America, respectfully prays that this Court advance this case on the docket, order a speedy jury trial at the earliest practicable date, cause the action to be in every way expedited, and, upon final hearing, order as follows:

      A.      That Defendant be ordered to cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

      B.      That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions,

plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

    C.    That Plaintiffs/Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

    D.    That Plaintiff Ferguson be awarded injunctive relief and/or all monetary damages resulting from Defendant's unlawful employment retaliation actions taken against against her, including but not limited to, lost wages and benefits both past and future, two (2) times the amount of back pay, and/or special damages;

    E.    That Plaintiffs/Relator be awarded all costs of this action, including attorneys' fees and expenses; and

    E.    That Plaintiffs/Relator recover such other relief as the Court deems just and proper.

DATED: <u>October 26, 2016.</u>

    Respectfully submitted,

    **LAW OFFICE OF DALE M. RODRIGUEZ**
    555 Republic Drive, 2nd Floor
    Plano, Texas 75074
    Phone: 214-713-4665
    Fax:    888-717-7542
    dale@dmrlawoffice.com

    By:  <u>/s/ Dale M Rodriguez</u>
           *Dale M. Rodriguez*
           *Texas Bar No. 00788302*
           *Florida Bar No. 0780081*

*Attorney for Plaintiff/Relator Ferguson*

### CERTIFICATE OF SERVICE ON THE UNITED STATES OF AMERICA

I hereby certify that on October 26, 2016, I served, via United State Postal Certified Mail, RRR, the foregoing Qui Tam Original Complaint, along with Relator's Disclosure Statement, on the United States of America as follows:

Loretta E. Lynch, Esq.
Attorney General, United States of America
*c/o* Lee J. Loftus
   Assistant Attorney General for Administration
U.S. Department of Justice
   Justice Management Division
950 Pennsylvania Avenue, NW, Room 1111
Washington, DC 20530

--and—

John R. Parker, Esq.
United States District Attorney
   for the Northern District of Texas
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699

                                       /s/Dale M. Rodriguez
                                        Dale M. Rodriguez